(No. 37590.—

LAPKUS BUILDERS, INC., Appellee, *vs.* THE CITY OF CHICAGO, Appellant.

*Opinion filed January 22, 1964.—Rehearing denied March 16, 1964.*

JOHN C. MELANIPHY, Corporation Counsel, of Chicago, (SYDNEY R. DREBIN and MARSILE J. HUGHES, Assistants Corporation Counsel, of counsel,) for appellant.

MAURICE J. NATHANSON, of Chicago, (ALLEN HARTMAN, of counsel,) for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

This is a direct appeal by the defendant, City of Chicago, from a declaratory judgment of the circuit court of Cook County invalidating the city zoning ordinance as applied to plaintiff's property. The cause has been properly certified to us by the trial court pursuant to section 75(1)(c) of the Civil Practice Act. Ill. Rev. Stat. 1961, chap. 110, par. 75(1)(c).

The realty in question is located on the northeast corner of South Kedzie Avenue and West 85th Street in the city of Chicago and contains an old frame house, a shack and two old garages. Plaintiff purchased the property in 1961 for $65,000. The premises have a frontage on South Kedzie Avenue of approximately 190 feet, a depth along West 85th Street to a public alley of approximately 162½ feet and contain approximately 31,000 square feet. Plaintiff seeks to construct thereon an apartment building or buildings containing 34 to 36 dwelling units, presenting alternate proposals for one building containing all units or three smaller buildings. The trial court held the area requirements of the ordinance void as applied to plaintiff's property and entered a decree which would permit construction of a building or buildings containing not more than 30 apartments with parking space for one automobile per apartment.

The sole issue before us involves the validity of the density restrictions found generally in section 7.5—3 of the city zoning ordinance. It establishes the minimum lot area for R-3 general residence districts as "not less than 2500 square feet of lot area per dwelling unit". The last paragraph of section 7.5—3, added by amendment in 1960, liberalized the R-3 density restrictions by reducing the minimum lot area to 1,650 square feet per dwelling unit in an R-3 district which fronts on a section-line street, as is Kedzie Avenue here. This last paragraph has given rise to an unofficial subclassification of the usual R-3 zone, which

classification is known as R-3A, R-3a or R-3½, among those who deal in zoning matters. Under the applicable density restrictions requiring each unit to have a minimum of 1,650 square feet, plaintiff is limited to the construction of 18 dwelling units on the property in question rather than the 34 to 36 units which it desired to construct.

The subject property lies in an "R-3a" district running along the east side of South Kedzie Avenue which is 3200 west, northward to a point one-half block south of West 83rd Street where it is interrupted for 1½ blocks by a B-4-1 restricted service district; this B-4-1 strip is occupied by a gas station at the southeast corner of 83rd and Kedzie, and two supermarkets, with some smaller business uses, in the block between 83rd and 82nd Streets. The remaining three blocks between 82nd and 79th streets are entirely R-2 or R-3. Proceeding southward the "R-3a" classification extends to at least West 87th Street. The width of the belt is from the middle of Kedzie Avenue eastward to the first public alley or about one lot's depth. Directly east of this R-3a belt and immediately adjacent to the subject property is an R-2 single-family residence district running eastward to Western Avenue or 2700 west between 79th and 87th streets. Conforming multiple-apartment dwellings flank the subject property on the north and south. Northward from these buildings on the east side of Kedzie are conforming single and multiple-unit dwellings, and southward are a two-flat building, an open area housing a radio station and several towers and finally, several blocks beyond, Luther High School. The area running eastward from the subject property and from Kedzie Avenue generally between 79th and 85th streets is largely single-family residence units built in the last 7 or 8 years.

On the west side of Kedzie Avenue and running northward from 85th Street to 81st Street is a B-4-1 restricted service district ½ block deep; it contains, directly opposite the subject property, a small nursery and garden supply

business. North of this are a tavern, a dance studio, several small offices, and similar business uses including a gas station on the northwest corner of 84th Place and Kedzie Avenue. Running westward from this B-4-1 belt is another large R-2 district. A cemetery runs southward on the west side of Kedzie from 85th Street to 87th Street. Both R-2 and R-3 districts require 100% off-street parking while an R-4 district requires 75% off-street parking.

Lapkus, the president and majority shareholder in plaintiff corporation, testified that his business is buying lots for speculation in addition to building and selling homes and some apartment buildings. He has been in business in the area in question for 7 years and has built about 150 homes. Lapkus testified that he bought the land to build apartments because he saw new apartments on both corners. At the time of purchase he said he did not know it was zoned R-3 although he is familiar with the zoning law of the city of Chicago. Lapkus further testified that as residential property he thought the highest and best use was for an apartment building of 34 to 36 units, which is the reason he paid so much for the property.

Brendan O'Connell, a real-estate broker in the city of Chicago since 1938 and familiar with the general area, testified for plaintiff that to get the greatest income out of the property the highest and best use would be for a 30-35 unit apartment and that such apartment would not detract from the general area at all. He further testified that if the property could be so used it would be worth $70,000, but would be worth only $36,000 if limited to a maximum of 18 apartment units. It was his opinion that this one apartment building as proposed would not hurt Kedzie Avenue at all because there is no more land available for other such buildings. On cross-examination O'Connell said he did not take the zoning classification into consideration when arriving at the highest and best use but considered only the potential income from the apartments. O'Connell stated that before

he would purchase the site for $70,000 he would want to be sure that he could use it for the highest and best use.

Arthur Kvale, a city zoning investigator, testified for defendant to the single-family residential character of the area including the subject property, to the commercial nature of the west side of Kedzie Avenue, and to the business and commercial nature of the area north of 79th Street.

Several homeowners in the immediate area testified to an already existing traffic and parking problem apparently arising from the businesses on Kedzie and the fact that there is often more than one car per dwelling unit in the area. Moreover they unanimously objected to a possible 36-unit apartment because they had settled in the area under the assumption that it would be composed of single-family dwellings.

George Kranenberg, a city planning and zoning consultant, who was technical director of the staff which prepared the 1957 comprehensive amendment to the city zoning ordinance and who is now privately employed, testified for defendant. He stated that the subject site is within a square mile of the city which was zoned and developed principally for single-family homes, except for that frontage on the section line streets which is "R-3½" or, in places, B-4. It was Kranenberg's opinion that the highest and best use for the subject site is within the confines of its present zoning based on density and use and on the structure and basis of the Chicago zoning ordinance. Moreover, he pointed out the relationship between the density of the area and the use as related to the density and use of the single-family district to the east. On cross-examination Kranenberg stated that as density increases the compatibility and relationship of dwelling units is lost; that the detriment increases in direct proportion to the density, and that density affects the number of people in an area, the traffic, the transportation, and all the public utilities provided within the city, such as sewer, water, electricity and gas. Kranenberg

thought that the 34 apartments would have a detrimental effect on the surrounding property.

John McNamara, a Chicago real-estate broker, testifying for defendant, stated that under the present classification the property is worth $225 per front foot or a little over $40,000 and, if zoned R-4, would be worth only several thousand dollars more. Moreover, McNamara said that plaintiff paid more for the property than he himself would have paid.

As we have frequently stated, the rules of law applicable to zoning matters have been so often reiterated that no necessity exists to lengthen this opinion by detailing them again. The issue here is as to whether the density restrictions imposed by the zoning ordinance are reasonably related to the health, welfare, morals and safety of the community. The presumption is that they are. (*Exchange Nat. Bank of Chicago* v. *County of Cook*, 25 Ill.2d 434.) Unless the proof is sufficient to overcome the presumption and establish that the questioned restrictions are arbitrary or capricious as applied to plaintiff's property, they will be upheld. (*Exchange Nat. Bank of Chicago* v. *City of Chicago*, 28 Ill.2d 341.) The general principle of limitation upon intensity of use as embodied in the Chicago zoning ordinance of 1957 was upheld by this court in a case quite similar to this. *Cosmopolitan Nat. Bank of Chicago* v. *City of Chicago*, 22 Ill.2d 367.

It is clear that except for the commercial strip along the west side of Kedzie Avenue the general area around the subject property is low density residential in character. Single-family residences of a value of $20,000—$25,000, plus several conforming apartment buildings comprise the dwellings in the area. The fact that the property is bounded on three sides by conforming dwellings, particularly the two proximate multiple-unit apartments, plus the testimony of residents of the area, indicates that those who have already built and settled the area have acquiesced in and relied upon the ordinance. Moreover, plaintiff has failed to point to a single dwelling in the area of the subject property which does

not conform to the density restrictions of the ordinance. The fact that there is a strip of commercially zoned property on the west side of Kedzie across from the subject property does not overcome the presumption that the ordinance, as a legislative enactment, is reasonably related to the health, morals, safety and welfare of the community, since zoning districts, by their nature, must begin and end somewhere and the presence of less restricted areas across the street does not make the restrictions in question unreasonable. *Mundelein Estates, Inc.* v. *Village of Mundelein,* 409 Ill. 291.

While the price of the property purchased by plaintiff was concededly greater than its value for the uses permitted by the ordinance, this fact has little, if any, significance under the circumstances here present. Plaintiff's president is an experienced buyer and builder, both for speculative purposes and otherwise, and is familiar with the area. He testified he did not know of the R-3 zoning, but his failure to inform himself thereon is of no assistance here where such information was readily available. Purchasers who acquire property with the expectation of using it for a purpose not permissible under current zoning restrictions should not expect loss resulting from denial of the proposed use to be a persuasive argument in securing the change. *Cities Service Oil Co.* v. *County of Lake,* 26 Ill.2d 176; *Vedovell* v. *City of Northlake,* 22 Ill.2d 611.

In our judgment the plaintiff's evidence fails to overcome the presumptive validity of the ordinance. At best it produces no more than a debatable question upon which the legislative judgment is conclusive. *Elmhurst Nat. Bank* v. *City of Chicago,* 22 Ill.2d 396.

The judgment of the circuit court of Cook County is therefore reversed.

*Judgment reversed.*